# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

No. 95-40435

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JON PAUL DENMAN and
MELVIS T. DENMAN,

Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Texas

November 14, 1996

Before POLITZ, Chief Judge, JOLLY and BARKSDALE, Circuit Judges.

POLITZ, Chief Judge:

Jon Paul Denman and Melvis Tyrone Denman appeal their convictions for conspiracy to distribute cocaine base. For the reasons assigned, we affirm.

## BACKGROUND

During an investigation of suspected cocaine trafficking, the Federal Bureau of Investigation obtained an order from the United States District Court for the Eastern District of Texas authorizing a wiretap of two telephone lines at the Houston home of Kendall Johnson. For 20 days in June 1994 the FBI intercepted, monitored, and recorded the calls at an FBI listening post in Nacogdoches, Texas. The wiretap evidence was filed during the trial of Jon Paul Denman and his cousin,

Melvis Tyrone Denman, and both were convicted of conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846.

Sixteen persons were charged in the conspiracy; all pled guilty except the Denmans. The magistrate judge set an October 11, 1994 deadline for filing pretrial motions for Jon Denman and a November 14, 1994 deadline for Melvis Denman. A superseding indictment was filed on October 6. On the same day that pretrial motions were due, Melvis Denman's court-appointed lawyer filed a motion to withdraw. He had filed no pretrial motions. On November 23 retained counsel sought to enroll for Melvis Denman and filed a motion seeking a continuance and revised scheduling order. The court granted the appointed lawyer's motion to withdraw, enrolled new counsel, granted Melvis Denman's motion for a continuance on the grounds that his new attorney needed time to prepare a complex case, and consolidated the two cases and set them for trial on January 4, 1995. The court denied the request for a new scheduling order and declined to allow the filing of any new pretrial motions, while allowing the withdrawal of appointed counsel, enrollment of new counsel, and the continuance of trial of the now consolidated cases. On December 13, 1994 Jon Denman's court-appointed attorney was replaced by retained counsel.

On January 3, 1995 the Denmans filed motions to suppress the wiretap evidence, contending that the court in the Eastern District of Texas had no jurisdiction to order a wiretap on phone lines located in the Southern District of Texas. The district court denied the motions as untimely because they were filed

beyond the date set by the court's previous order and on the eve of trial.

During voir dire the Denmans objected to the prosecution's peremptory challenge of a black woman. Determining that the prosecution had a nonracial reason for the exclusion, the court overruled the objection. After a defense complaint about a conversation which took place between Mike Kelly, an agent who had worked on the government's case, and two jurors, the judge conducted a hearing at which the jurors testified that the three had not discussed anything concerning the case. The court denied motions for a mistrial. The jury returned guilty verdicts. The Denmans timely appealed.

<u>ANALYSIS</u>

<u>Admissibility of Wiretap Evidence</u>.

After refusing to extend the deadline for filing pretrial motions, the district court denied defendants' motions to suppress the wiretap evidence as untimely, without consideration of the merits. Fed.R.Crim.P. 12(c) provides that the court may set a time for the making of pretrial motions or requests. Rule 12(f) provides that the failure of a party to make pretrial motions by the time set pursuant to Rule 12(c) constitutes waiver, but the court "for cause shown may grant relief from the waiver." Under the Omnibus Crime Control and Safe Streets Act ("Title III"), "[a]ny aggrieved person in any trial, hearing, or proceeding in or before any court . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that . . . the order of authorization or approval under which it was intercepted is

insufficient on its face." Such motion "shall be made before the trial, hearing, or proceeding unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion."[1]

A decision to deny a suppression motion as untimely under Rule 12(f) is reviewed for abuse of discretion,[2] giving due consideration to the movant's reason for missing the relevant deadline and any prejudice the refusal might occasion.[3]

The Denmans contend that because the court-appointed attorneys filed no pretrial motions and the trial court considered Melvis Denman's retention of a new attorney sufficient grounds for continuing the trial, it was unreasonable not to allow the new attorneys time to file motions. The government contends that the filing of the suppression motions the day before trial was untimely and was an attempt to abuse the rules. We will assume without deciding that the district court abused its discretion when it allowed counsel to enroll and continued the trial, but refused to extend the scheduling order, even briefly, to allow the newly-enrolled counsel to file pretrial motions. We therefore turn to consider whether the district court's error was prejudicial. The only prejudice advanced by the defendants is that the evidence of the wiretaps should have been suppressed.

The Denmans contend that the wiretap jurisdictionally was defective because it was authorized by a judge outside the judicial district in which the subject

---

[1] 18 U.S.C. § 2518(10)(a).

[2] **United States v. Knezek**, 964 F.2d 394 (5th Cir. 1992).

[3] See **Wainwright v. Sykes**, 97 S.Ct. 2497 (1977); **United States v. Elam**, 678 F.2d 1234 (5th Cir. 1982); 1 C. Wright, Federal Practice and Procedure § 193.

4

telephones were located. The wiretap order was issued by a judge in the Eastern District of Texas where the calls were monitored and recorded; the tapped telephones were located in Houston within the Southern District of Texas.

Title III provides that a judge may enter an order "authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting."[4] Intercept is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."[5]

The issue whether, for Title III jurisdictional purposes, an interception takes place only where the communication is initially seized by law enforcement, is *res nova* for our Circuit. Our colleagues in the Second Circuit, in **United States v. Rodriguez**,[6] interpreted interception as used in Title III to include both the place where the lines are tapped and the place where the communications are heard by law enforcement. They held that a wiretap order may be issued by a court in either jurisdiction. Confronting a fact situation very similar to that in the instant case, **Rodriguez** rejected an argument that orders to wiretap New Jersey telephones were defective because they were issued by a district judge in New York. The court found that the location of an interception includes, but is not limited to, the situs of the telephone itself. Because the definition of interception encompasses the aural

---

[4] 18 U.S.C. § 2518(3).

[5] 18 U.S.C. § 2510(4).

[6] 968 F.2d 130 (2d Cir.), <u>cert</u>. <u>denied</u>, 113 S.Ct. 139, 140 & 663 (1992).

acquisition of the contents of the communication, "the interception must also be considered to occur at the place where the redirected contents are first heard."[7] The court reasoned that because aural is defined as "pertaining to the ear or the sense of hearing," it follows that "the place where the contents of a wire communication are first to be heard and understood by human ears, other than those of the parties to the conversation, is the situs of an interception within the meaning of § 2510(4)."[8] In a decision interpreting a similarly worded Oklahoma wiretap law, our colleagues in the Tenth Circuit adopted the **Rodriguez** holding that the location of an interception includes the place where law enforcement officers listened to the communication which they intercepted.[9]

The Denmans contend that the contents of phone communications are acquired for Title III purposes only at the time the lines are tapped. They contend that **United States v. Turk**[10] and **United States v. Nelson**[11] support the proposition that interception occurs only where the communication initially was obtained. In **Turk** we rejected an argument that the police officers' listening to an audiotape

---

[7]**Id.** at 136.

[8]**Id.** (quoting Webster's New Internat'l Dictionary at 182 (2d ed. 1957). The phrase "or other" was inserted after aural in section 2510(4) in 1986 to ensure privacy protection for new forms of communication such as electronic pagers, electronic mail, and computer-to-computer communications, thus expanding the previous definition that had only applied where the contents of a communication could be overheard and understood by the human ear. **Rodriguez** at 136 (quoting 1986 U.S. Code Cong. & Admin. News 3556).

[9]**United States v. Tavarez**, 40 F.3d 1136 (10th Cir. 1994).

[10] 526 F.2d 654 (5th Cir.), cert. denied, 429 U.S. 823 (1976).

[11] 837 F.2d 1519 (11th Cir.), cert. denied, 109 S.Ct. 82 (1988).

which had been made by an arrestee was an illegal interception under Title III. We held that an interception "requires, at the least, involvement in the initial use of the device contemporaneous with the communication to transmit or preserve the communication."[12] **Turk** acknowledged, however, without deciding, that "aural acquisition" might encompass two activities: the initial acquisition by a device and the hearing of the communication by the person responsible for the recording. **Turk** does not limit the definition of interception to the initial acquisition by a device.

In **Nelson** the Eleventh Circuit held that interception as used in Title III "refers to the place where a communication is initially obtained regardless of where the communication is ultimately heard."[13] **Nelson**, however, involved facts which are the mirror opposite of those in the case at bar: the wiretapped telephones were located in the authorizing judge's jurisdiction but the signals were transmitted to a law enforcement listening post outside the judicial circuit. Thus, while the holding of **Nelson** is that the initial acquisition is an interception, the court did not rule out the possibility that the initial listening to the recording by the intercepting agent might also be considered part of the interception. In any event, **Nelson** noted that territorial jurisdictional limitations did not implicate Congress's core concerns in passing Title III.[14]

---

[12]**Turk** at 658 n.3.

[13]**Nelson** at 1527.

[14]**Id.**

We agree with the reasoning of the Second Circuit and now hold that interception includes both the location of a tapped telephone and the original listening post, and that judges in either jurisdiction have authority under Title III to issue wiretap orders. As the **Rodriguez** court noted, this interpretation aids an important goal of Title III, to protect privacy interests, by enabling one judge to supervise an investigation that spans more than one judicial district. "If all of the authorizations are sought from the same court, there is a better chance that unnecessary or unnecessarily long interceptions will be avoided."[15]

Based on the foregoing, we conclude that even if the district court abused its discretion in refusing to extend the scheduling order to allow the defendants to file pretrial motions, there was no resultant prejudice and the error was therefore harmless.

**Batson** Challenge.

The Denmans challenge the prosecutor's peremptory excusal of Betty Tanner, an African-American. The prosecution explained its action thusly:

> A:    Your honor, I did not strike Ms. Tanner because she is African-American. I struck her because she is from the town of San Augustine. This spring an article critical of [a] San Augustine investigation was released in the New Yorker magazine. I know from my experience that the fallout from the so-called white tornado investigation that there are hard feelings in San Augustine and she is a relative of the individual [who] was investigated in that case, and in view of the law enforcement in San Augustine County does not have a favorable view of the federal government because of that investigation. I know that of my own personal experience. In addition,

---

[15]**Rodriguez** at 136.

8

Ms. Tanner was single. My own preference is for people who are married and of that type have stability.

Q: I thought I did hear her say something where she was a relation to some of the parties that y'all prosecuted.

A: She was related to Jeffery Tanner who is now deceased who was a party in that case.

Q: What type of party?

A: He was investigated at the time. He was not prosecuted because he was already in the state prison at the time the indictments were returned in June or May of 1989.

The court then stated:

I find that Mr. Bales has been able to articulate a non-racial reason, specifically the investigation that this court takes judicial notice of that occurred in San Augustine County and it has created hard feelings along with the articles that have been written by the citizens of San Augustine condemning law enforcement officers, so I'm going to allow his strike to remain.

An allegation of racial discrimination in the use of peremptory challenges mandates a three-step inquiry: (1) the defendant must establish a *prima facie* case by raising an inference that the prosecution struck potential jurors because of their race; (2) the prosecution must articulate race-neutral and reasonably specific explanations for each challenged strike; and (3) the trial court must determine whether the defendant has proved intentional discrimination.[16]

We review for clear error the trial court's finding whether discrimination in violation of **Batson** occurred, giving great deference to the district court's finding that the prosecutor's explanation was credible.[17]

The Denmans characterize as specious the prosecutor's explanation that

[16]**Purkett v. Elem**, 115 S.Ct. 1769 (1995); **Batson v. Kentucky**, 106 S.Ct. 1712 (1986).

[17]**United States v. Wallace**, 32 F.3d 921 (5th Cir. 1994).

Tanner is from a town where the prosecutors conducted a high-profile investigation. They further contend that the fact that the juror was a relative of a target of the investigation is also pretextual because the woman testified that she was "not really close" to him. We entertain no doubt that a prosecutor may use a peremptory challenge to exclude a potential juror with a family relationship to a person targeted by the same prosecutor in a controversial, much-publicized criminal investigation. Indeed a challenge for cause would not be inappropriate. Because the prosecution need only articulate a non-racial explanation for a peremptory challenge, the trial court's implicit finding that the Denmans failed to prove intentional discrimination is not erroneous.

Communication with Jurors.

Jon Denman appeals the district court's denial of appellants' motion for mistrial based on communications between Mike Kelly, an agent who worked on the government's case, and two jurors. On the third day of trial, Melvis Denman's attorney notified the judge that he had observed during the trial

> on at least three, possibly four occasions where during the breaks or prior to court convening, and if I'm not mistaken, maybe one time after court had let out, that various members of the jury would be standing around in a very informal social manner . . . and that Mike Kelly, who is a member of the Deep East Texas Drug Task Force who has been identified and pointed out by the government in this case as an agent who has worked on this case . . . engaged in a conversation [with] a woman [who] was on this jury panel.

Upon learning of the matter, the court immediately conducted a hearing outside the presence of the jury. Under cross-examination by defense counsel, Kelly testified that as he was leaving the courthouse during a recess one of the

10

jurors jokingly said to him that it was too early to leave because he did not work "bankers' hours." Kelly testified that they discussed a state trooper whom the juror knew who did work "bankers' hours" giving safety speeches. Kelly testified that he did not discuss the case with the jurors. Under interrogation by the court the two jurors testified that they did not discuss the case with Kelly, but had talked only about going home that day, about the Department of Public Safety, and about a state trooper one of them knew. The court instructed the jurors not to talk to anyone other than the bailiffs, ordered Kelly to remain outside the courthouse until the trial ended, and denied the motion for a mistrial.

We review for abuse of discretion a trial judge's denial of a motion for mistrial based on allegations of improper extrajudicial conduct by jurors.[18]

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.[19]

The trial court is required to conduct a hearing to determine the circumstances of the communication, its impact on the juror, and whether prejudice resulted.[20] We have required a two-step inquiry: (1) whether the challenged interchange was about the matter pending before the jury, and (2) whether the defendant was

---

[18]**United States v. Burke**, 496 F.2d 373 (5th Cir.), <u>cert</u>. <u>denied</u>, 95 S.Ct. 229 (1974).

[19]**Remmer v. United States**, 74 S.Ct. 450, 451 (1954) (citations omitted).

[20]**Smith v. Phillips**, 102 S.Ct. 940 (1982).

11

prejudiced by the discussion.[21] In some cases, even when the pending case was not discussed, fraternizing between jurors and third parties may prejudice the defendant and require reversal. An appellate court may order reversal when the trial court conducted an insufficient investigation to determine whether such communications were clearly not prejudicial.[22]

We conclude that the trial court's investigation was sufficient to make a reasonable determination that the communication, while improper, was clearly not prejudicial. The testimony of Kelly and the jurors establishes that the communication was not about the pending matter and that the contact was insignificant enough to eliminate concern that the Denmans might be prejudiced. Under examination by defense counsel, Kelly testified that this was the first time he had spoken with a juror in the case other than to exchange greetings.

By thoroughly investigating the matter, subjecting Kelly to cross-examination by defense counsel, cautioning the jury, and banning Kelly from the courthouse, the trial judge took effective steps to ensure the impartiality of the jury. Under these circumstances, we are not prepared to say that the court's overruling of the Denmans' motion for a mistrial was an abuse of discretion.

The judgments appealed are AFFIRMED.

---

[21]**Burke**.

[22]**United States v. Betner**, 489 F.2d 116 (5th Cir. 1974).