**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ken RAMIREZ, Peter Hotchkiss, Paul Hotchkiss, and Patrick Flynn, Defendants–Appellants.**

Nos. 96–2237, 96–2257, 96–2276 and 96–2340.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1997.

Decided April 28, 1997.

Larry Wszalek (argued), Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

Charles L. Hawkins, Minneapolis, MN (argued), Douglas W. Thomson (argued), Earl P. Gray (argued), and Paul Applebaum (argued), St. Paul, MN, for Defendants–Appellees.

Before POSNER, Chief Judge, and ROVNER and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

The four appellants were tried together in the U.S. District Court for the Western District of Wisconsin, convicted by a jury of conspiracy to distribute methamphetamine, and sentenced to long prison terms. They raise a number of issues, but only one has possible merit, and only one other has sufficient colorable merit to warrant discussion. The details of the conspiracy are irrelevant to these issues, except that it is important to keep in mind that the conspiracy straddled the border between two states, Wisconsin and Minnesota.

The substantial issue, which is presented by appellants Patrick Flynn and Paul Hotch-

kiss, relates to the admission of evidence obtained by a government wiretap of a cellular phone (actually two phones, but the second need not be discussed separately). The government had information that Hotchkiss, who lived in Wisconsin but dealt drugs in St. Paul, was using a cellular phone, owned by Flynn, in aid of the conspiracy and was carrying the phone with him as he traveled back and forth between his home in Wisconsin and his illegal business in Minnesota. On the basis of this information the government obtained from a district judge in the Western District of Wisconsin, where the appellants' conspiracy was being investigated and would later be prosecuted, an order authorizing the wiretapping of the cellular phone line. The order was issued on April 13, 1995, was by its terms good for only 30 days, and required the government to submit a progress report at the end of that time. The government set up a listening post in Minnesota to eavesdrop on calls made from the cellular phone. It located the post in Minnesota rather than in Wisconsin because it was afraid that the agents manning it would be recognized in the defendants' home stamping ground.

Within a few days after the order was issued the agents manning the post learned from conversations that they intercepted that the cellular phone was not being used by Hotchkiss—that he was using a different phone—and that the user of the phone that they were tapping did not seem to travel outside Minnesota. The user was, however, talking with Flynn over this phone and the conversations concerned the drug conspiracy that the government was investigating. At the end of the 30 days in which the order was in force the government asked the district judge for an extension of the order for another 30 days but did not disclose to the judge either that the listening post was located in Minnesota rather than in the Western District of Wisconsin or that the user of the phone they were tapping was using it only in Minnesota. The judge granted the motion for an extension. The case was later reassigned to a different judge, who when she learned that the communications and interceptions were entirely within Minnesota ordered the evidence obtained by the wiretap after the expiration of the original 30–day period suppressed on the authority of 18 U.S.C. § 2518(10)(a)(i), which directs the suppression of information obtained by an unlawful interception. The court's reasoning was that the statute which authorized the wiretap, Title III of the Safe Streets and Crime Control Act of 1968, does not permit a federal district court to authorize wiretapping in another federal district. The court refused to suppress the evidence obtained during the term of the original order, however, because that order had been issued in response to an application that had been based upon the government's reasonable and good-faith belief that the phone line was being used in the Western District of Wisconsin.

■■■ There is a difficulty with the court's reasoning concerning the period between the discovery by the government agents that the cellular phone was not being used in Wisconsin and the expiration of the original order. It is true that if government agents execute a valid wiretap order and in the course of executing it discover that it was procured by a mistake and at the same time overhear incriminating conversations, the record of the conversations is admissible in evidence. *United States v. London,* 66 F.3d 1227, 1234–35 (1st Cir.1995); cf. *United States v. Malekzadeh,* 855 F.2d 1492, 1496–97 (11th Cir. 1988). It is just the "plain view" doctrine (e.g., *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *United States v. Ewain,* 88 F.3d 689, 693 (9th Cir. 1996)) translated from the visual to the oral dimension. It is as if government agents executing a conventional search warrant discover that they have the wrong address but before they can withdraw notice other illegal activity. E.g., *Maryland v. Garrison,* 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987); *United States v. Williams,* 917 F.2d 1088 (8th Cir.1990). The discovery of the mistake does not make the search unlawful from its inception, *United States v. Fitzgerald,* 724 F.2d 633 (8th Cir.1983) (en banc); *United States v. Soussi,* 29 F.3d 565 (10th Cir.1994); *United States v. Noel,* 938 F.2d 685, 687–88 (6th Cir.1991), because all that is required for a lawful search is *probable* cause to believe that the search will turn up evidence or fruits

of crime, not certainty that it will. But in either case, the visual or the aural, once the mistake is discovered, the government cannot use the authority of the warrant, or of the order, to conduct a search or interception that they know is unsupported by probable cause or is otherwise outside the scope of the statute or the Constitution. *Maryland v. Garrison, supra,* 480 U.S. at 87, 107 S.Ct. at 1018; *Dawkins v. Graham,* 50 F.3d 532, 534 (8th Cir.1995). No longer would they be merely discovering evidence of crime in the course of a lawful search.

No doubt the agents were entitled to some leeway to continue listening until they were sure that Hotchkiss hadn't just lent the phone to his coconspirator and would soon retrieve it and carry it back with him to his home in Wisconsin. But it appears that this uncertainty was dissipated before the order expired, rather than conveniently ending at the precise moment of expiration.

■ We need not pursue this issue. We do not think that the location of the phone affected the legality of the tap, and we do not understand anyone to be arguing that it matters who was using the phone, since the person to whom Hotchkiss gave it and whose conversations the agents overheard was (and this was obvious from the conversations) a participant in the same conspiracy. Nor must the evidence be suppressed because the tap was not authorized by the order. 18 U.S.C. § 2518(10)(a)(iii). The order contains no geographical limitation. Indeed, it provides that "in the event that the cellular telephone is transferred outside the territorial jurisdiction of this Court, interceptions may take place in any other jurisdiction within the United States." It is not certain that the phone in issue was transferred outside of the Western District of Wisconsin; it may never have been there; but we do not read the order as limited to the case in which the phone was at some time in the district.

■ The statute authorizes a district judge to approve a tap "within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction)." 18 U.S.C. § 2518(3). An interception takes place both where the phone is located (including, we suppose, although we can find no cases, where the receiving phone is located) and where the scanner used to make the interception is located. *United States v. Denman,* 100 F.3d 399, 403 (5th Cir.1996); *United States v. Rodriguez,* 968 F.2d 130, 136 (2d Cir.1992). So, read literally, the statutory language that we have quoted does not authorize a judge in the Western District of Wisconsin to authorize the interception by a stationary listening post in Minnesota of calls from a cellular phone located in Minnesota, but it would authorize the judge to authorize the interception by a stationary listening post in Minnesota of calls from a cellular phone in the Western District of Wisconsin, by a stationary listening post in that district of calls from anywhere, and by a mobile listening post (or other mobile interception device) authorized in the western district but located anywhere in the United States of calls from anywhere. The literal reading makes very little sense. It would mean that if as in this case the listening post is stationary and is for practical reasons located outside the district in which the crime is being investigated and the cellular phone is believed to be located, the government, to be sure of being able to tap the phone if it is carried outside the district (as is it is quite likely to be, given its mobility), must obtain the wiretap order from the district court in which the listening post is located, even though that location is entirely fortuitous from the standpoint of the criminal investigation.

■ The legislative history of Title III suggests, unsurprisingly, that "mobile interception device" was intended to carry a broader meaning than the literal one. The history describes the term as applicable "to both a listening device installed in a vehicle and to a tap placed on a cellular or other telephone instrument installed in a vehicle." S.Rep. No. 541, 99th Cong., 2d Sess. 30 (1986), U.S.Code Cong. & Admin.News 1986, pp. 3555, 3584. We take this description to be illustrative rather than definitional because there is no limitation to vehicles in the statute. Now a "bug" planted in a car phone is not a "mobile interception device" in an

obvious sense; it is a stationary device affixed to a stationary object in a moving vehicle. And a tap is not placed in the telephone handset itself; it is attached to the telephone line at some distance from the handset. The listening post in this case intercepted transmissions between microwave towers that relayed cellular phone calls, and so was analogous to a tap affixed to a telephone cable outside the subscriber's premises. The emphasis in "mobile interception device" falls, it seems to us (there are no other published decisions on the point), on the mobility of what is intercepted rather than on the irrelevant mobility or stationarity of the device. The term in context means a device for intercepting mobile communications, and so understood it authorized the district judge in the Western District of Wisconsin to order a tap on the phone thought to be used by Hotchkiss, regardless of where the phone or the listening post was. The narrow, literal interpretation would serve no interest in protecting privacy, since the government can always seek an order from the district court for the district in which the listening post is located authorizing nationwide surveillance of cellular phone calls. The narrow interpretation would merely complicate law enforcement.

■ The second issue is raised by appellant Ramirez. He was arrested at home, sitting in the living room with his pregnant girl friend and his teenaged daughter. The arresting agents took him into a bedroom and asked him to cooperate with them. He asked them what was in it for him and they told him that if he cooperated the U.S. Attorney could ask the judge for a downward departure from the guidelines sentence. Ramirez said he was willing to talk and the agents took him to a police station and read him the *Miranda* warnings, after which he gave them an incriminating statement that at trial he moved to suppress on the ground that it had been coerced. He argues that he was coerced to agree to cooperate and that once he agreed, the warnings, assuring him that silence wouldn't be used against him, were a formality—almost as if by agreeing to cooperate he had bound himself contractually to speak and could not refuse no matter what he was later told.

■ There are indeed steps that police might take in conjunction with or in advance of giving the *Miranda* warnings that would nullify or at least undermine them—for example, telling the suspect that if he refuses to talk to them his lack of cooperation will be reported to the prosecutor. E.g., *Collazo v. Estelle*, 940 F.2d 411, 417 (9th Cir.1991) (en banc); *United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir.1991); *United States v. Harrison*, 34 F.3d 886, 890–92 (9th Cir.1994); see also *United States v. Anderson*, 929 F.2d 96 (2d Cir.1991). But there is nothing like that here. If there was coercion in the interrogation in the bedroom, still it was not coercion calculated to render the later warnings nugatory; and anyway there was no coercion. The agents made no threats or promises. Merely pointing out, what is anyway obvious, that cooperation with the police can result in a reduced sentence or other concessions down the road is not a promise and is not calculated to prevent the suspect from rationally considering whether or not to speak. *United States v. Harrison*, *supra*, 34 F.3d at 891; see also *United States v. McGuire*, 957 F.2d 310, 315 (7th Cir.1992); *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir.1990).

AFFIRMED.