**REVISED OCTOBER 25, 2013**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**
October 24, 2013

Lyle W. Cayce
Clerk

No. 11-60763

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

RICHARD NORTH,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Mississippi

Before STEWART, Chief Judge, and DeMOSS and GRAVES, Circuit Judges.
PER CURIAM:

The court sua sponte grants rehearing, withdraws its previous opinion in this matter, *United States v. North*, 728 F.3d 429 (5th Cir. 2013), and substitutes the following.

Appellant Richard North appeals the district court's denial of his motion to suppress evidence obtained from the interception of his cellular phone. Information obtained from the interception led to North's arrest for possession

No. 11-60763

of cocaine.  For the following reasons, we reverse the district court's denial of his motion to suppress.

## I.

This case stems from the government's investigation of Kenneth Lofton, a Jackson, Mississippi-based cocaine and marijuana distributor.  As part of its investigation, the government sought wiretaps on various cell phones.  Judge Wingate in the United States District Court for the Southern District of Mississippi authorized wiretaps on two cell phones (Target Telephone 1 and Target Telephone 2) that were used by Lofton.  From these wiretaps, Drug Enforcement Agency (DEA) agents intercepted phone conversations between Lofton and a person known as "Jack," arranging an upcoming cocaine transaction.  On March 16, 2009, Lofton and "Jack" met in a parking lot in Jackson.  The truck driven by "Jack" was registered to Jerry Primer.  On March 18, 2009, the government obtained a third wiretap warrant for "Jack's" cell phone (Target Telephone 3).  On March 19, 2009, DEA agents obtained a driver's license photograph confirming that "Jack" was in fact Primer.

On March 28, 2009, Primer received a phone call from "Billy," during which the two agreed to meet at a Jackson home used by Primer.  Agents followed Primer to the residence, where they observed a Ford Explorer with a Texas license plate parked in the driveway.  The Ford Explorer was a rental car that was later determined to have been rented by Richard North.

Based on surveillance and information gathered from intercepted phone calls between Primer and "Billy," the government applied for a warrant authorizing interception of phone calls to and from the phone used by "Billy" (Target Telephone 4).  The government stated that it had probable cause to believe the targeted phone was "in the possession of and [was] being used by [BILLY]," and further declared that "Billy" had been identified as a member of a narcotics trafficking organization.  The application for the warrant was

2

No. 11-60763

supported by an affidavit from DEA agent Christopher Gale, which explained that interception was necessary because normal investigative procedures had been tried and failed or appeared unlikely to succeed if tried. The district court approved the application.

Based on phone calls intercepted pursuant to the wiretap of Target Telephone 4, the government concluded that "Billy" was Richard North, and that North and Primer were planning a delivery of cocaine to Jackson on May 16, 2009. Agents also received a copy of North's driver's license photograph. On the date in question, agents learned that North was en route to Jackson from Houston, Texas. Texas state troopers stopped North for speeding. North's vehicle was searched by officers and drug-sniffing dogs, but no cocaine was found. Three hours after he was stopped, North was released. Immediately after the stop, a third party listening agent in Metairie, Louisiana intercepted a call on North's cell phone between North and a female friend. For approximately the first fifty minutes of the call, North talked about a recent concert and about the traffic stop, complaining that he had been wrongfully detained and racially profiled. Approximately one hour into the call, North revealed that he had cocaine hidden in the car and was returning to Houston. The listening agent forwarded this information to officers in Texas, who intercepted North at his home. North was subsequently arrested for possession of cocaine.

## II.

In November 2009, North and his co-conspirators were indicted for, *inter alia*, conspiring to distribute more than fifty grams of cocaine. North moved to suppress the evidence gathered pursuant to the wiretaps on Target Telephones 3 and 4. North moved to suppress evidence gathered pursuant to the wiretap on Target Telephone 4 on the grounds that (1) the district court that authorized the wiretap lacked territorial jurisdiction and (2) agents failed to minimize

interception of the May 16, 2009 phone call. North moved to suppress evidence gathered pursuant to the wiretaps on both Target Telephones 3 and 4 on the ground that the wiretap applications contained material misrepresentations and omissions. After an evidentiary hearing, the district court denied North's motion.

On appeal, North argues that: (1) the district court in Mississippi lacked territorial jurisdiction to authorize the interception of his May 16, 2009 call because his phone was located in Texas and the listening post was located in Louisiana; (2) the government's applications for authorizations contained material misrepresentations and omissions, which undermine the government's required showings of necessity to resort to wiretaps as an investigative tool; and (3) the government did not comply with monitoring minimization requirements. Because we conclude that the government did not comply with minimization requirements, we do not reach North's other arguments.

## III.

North argues that the evidence gathered as a result of the interception of his May 16, 2009 phone call should be suppressed because the agents listening in Metairie did not comply with minimization requirements. Specifically, North argues that listening agents conducted essentially uninterrupted monitoring of a conversation that had no objective connection to the drug smuggling investigation.[1] The government argues that the agents made reasonable minimization efforts, emphasizing that during the call North complained about racial profiling and what occurred during the traffic stop; and that the

---

[1] North contends, and the district court appears to have accepted, that the instructions provided to the agents "authorized spot monitoring for not more than two minutes, and authorized continued monitoring when the conversation relate[d] to the alleged crimes under investigation." However, we can find no evidence in the record to support this claim. North's motion to suppress filed in the district court states that a copy of these instructions is attached as an exhibit, but the record contains no such exhibit.

conversation occurred immediately after North's car had been searched for drugs and the agents knew from other tapped conversations that drugs were concealed in the vehicle.

"This court reviews the district court's determination of the reasonableness of minimization efforts for clear error." *United States v. Brown*, 303 F.3d 582, 603 (5th Cir. 2002). "Under the clearly erroneous standard, we may not reverse the district court's findings of fact unless the review of the relevant evidence leaves us with 'the definite and firm conviction that a mistake has been committed.'" *Broussard v. United States*, 989 F.2d 171, 178 (5th Cir. 1993) (quoting *U.S. Gypsum*, 333 U.S. at 395). Electronic surveillance must "'be conducted in such a way as to minimize the interception of communications not otherwise subject to interception.'" *Brown*, 303 F.3d at 604 (quoting 18 U.S.C. § 2518(5)). To comply with § 2518(5), the "government's efforts to minimize interception of non-pertinent conversations must be objectively reasonable in light of the circumstances confronting the interceptor." *Id.* (internal quotation marks omitted). We consider three factors in determining the objective reasonableness of the government's efforts to minimize: "'(1) the nature and scope of the criminal enterprise under investigation; (2) the Government's reasonable inferences of the character of a conversation from the parties to it; and (3) the extent of judicial supervision.'" *Id.* at 604 (quoting *United States v. Bankston*, 182 F.3d 296, 307 (5th Cir. 1999)).

The government contends, and the district court appears to have accepted, that during the conversation, the listening agents stopped listening in on the call eight times, for a total of six minutes and seventeen seconds. However, we can find no evidence in the record to support the government's contention that the phone call was minimized. The record cite provided by the government does not speak to the minimization efforts made during the May 16, 2009 phone call.

5

No. 11-60763

Even if the alleged minimization did occur, we do not find the effort to have been objectively reasonable. The affidavit in support of the application to wiretap North's phone stated that "monitoring will be suspended if the conversation is not criminal in nature or is not otherwise related to the offenses under investigation," and that "spot checks" would be conducted "to insure that the conversation ha[d] not turned to criminal matters." However, the agents did not stop listening when it was made clear that the conversation was not criminal in nature and then conduct brief "spot checks." Rather, assuming the alleged minimization occurred, the agents listened to a non-pertinent conversation for nearly one hour, suspending monitoring only eight times for an average of less than one minute each time. Although the government asserts that the context supported continuous listening because North had been stopped on what the government believed to be a drug run, it seems just as likely that North's failure to immediately discuss his near miss during the conversation demonstrated that the phone call was not related to the drug crimes under investigation.

Additionally, while North discussed the stop at various times during the first fifty minutes of the call, his emphasis was that he had been wrongfully detained and racially profiled – not that he was engaged in criminal activity. Moreover, North was not speaking to a member of the drug smuggling conspiracy. Until the very end of the conversation, nothing of the conversation was criminal in nature or referenced the smuggling activities. Under these circumstances, it was not objectively reasonable for agents to listen in for nearly one hour to a conversation that did not turn to criminal matters until the last few minutes. We therefore conclude that the district court clearly erred in finding that these minimization attempts were objectively reasonable. As such, the evidence obtained from the May 16, 2009 interception of North's cell phone must be suppressed.

6

No. 11-60763

## IV.

For the foregoing reasons, we find that the government failed to comply with statutory minimization requirements when monitoring North's May 16, 2009 phone call.  We therefore REVERSE the district court's denial of North's motion to suppress and REMAND for further proceedings.

No. 11-60763

DeMOSS, Circuit Judge, specially concurring:

I concur with the majority opinion. I write separately because I would have reached the issue of territorial jurisdiction and concluded that the district court lacked the authority to permit interception of cell phone calls from Texas at a listening post in Louisiana for the following reasons.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 authorizes the use of wiretap surveillance in the context of a criminal investigation. 18 U.S.C. § 2516. To intercept communications between private persons, law enforcement officers must apply for authorization from a federal judge. Id. The judge may enter an ex parte order authorizing the interception of "wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction) . . . ." *Id.* § 2518(3). This court has stated that "interception includes both the location of a tapped telephone and the original listening post, and that judges in either jurisdiction have authority under Title III to issue wiretap orders." *United States v. Denman*, 100 F.3d 399, 403 (5th Cir. 1996).

I interpret the above authorities to mean that, except in the case of a mobile interception device, a district court cannot authorize interception of cell phone calls when neither the phone nor the listening post is present within the court's territorial jurisdiction.  This, however, is exactly what the district court did in this case.  The order authorizing the wiretap provided that "in the event that TARGET TELEPHONE 4 is transferred outside the territorial jurisdiction of this Court, interceptions may take place in any other jurisdiction within the United States."  Furthermore, the district court did not require that the listening post remain within its territorial jurisdiction, and the affidavit accompanying the government's application for a wiretap

8

explicitly stated that the listening post would be located in Louisiana. In short, the district court, located in the Southern District of Mississippi, lacked the authority to permit interception of cell phone calls from Texas at a listening post in Louisiana.

The government argues that the district court's order was proper because it involved a "mobile interception device." This court has not yet determined what "mobile interception device" means. In *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997), the Seventh Circuit was tasked with determining whether a district court in Wisconsin had the authority to issue a warrant to intercept calls on a Minnesota cell phone being listened to at a post in Minnesota. The court first looked to the legislative history of § 2518(3), which states that the term "mobile interception device" "applies to both a listening device installed in a vehicle and to a tap placed on a cellular or other telephone instrument installed in a vehicle." 112 F.3d at 852 (quoting S. Rep. No. 541, at 30 (1986)). Rejecting a literal interpretation of the phrase "mobile interception device," the court found that the "emphasis in 'mobile interception device' falls . . . on the mobility of what is intercepted rather than on the irrelevant mobility or stationarity of the device." *Id.* at 853. The court concluded that "[t]he term in context means a device for intercepting mobile communications," and held that when the device being intercepted is mobile, a judge may issue a wiretap warrant on that device "regardless of where the phone or the listening post" is located. *Id.*

I disagree that Congress intended to expand the scope of a district court's authority to issue wiretap warrants in any jurisdiction in the United States when the device to be intercepted a cell phone. Generally, the plain meaning of a statute controls unless the literal interpretation produces a result demonstrably at odds with the legislative intent. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989); *New Orleans Depot Servs.,*

*Inc. v. Dir., Office of Worker's Comp. Programs*, —F.3d—, 2013 WL 1798608, at *7 (5th Cir. Apr. 29 2013) (en banc) ("[T]he first rule of statutory construction is that we may not ignore the plain language of a statute."). "Mobile" modifies "device," thus the phrase "mobile interception device" on its face appears to refer to the mobility of the device used to intercept communications, not the mobility of the tapped phone.  I decline to interpret the statute in any way that eliminates important provisions regarding territorial restrictions in the case of cell phones, particularly when such an interpretation is not obvious from the statutory language.

The government has not offered any evidence showing that North's cell phone communications were intercepted using a device that was itself mobile. Accordingly, I find the "mobile interception device" clause inapplicable. A   s explained above, the district court lacked authority to permit the interception of cell phone calls from Texas at a listening post in Louisiana. Title III provides that interception of a wire communication may be suppressed if "the order of authorization or approval under which it was intercepted is insufficient on its face." 18 U.S.C. § 2518(10)(a)(ii).  Not every failure to comply with Title III's statutory requirements mandates suppression. Suppression is required "only for a 'failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.'" *United States v. Donovan*, 429 U.S. 413, 433-34 (1977) (quoting *United States v. Giordano*, 416 U.S. 505, 527 (1974)).

North urges this court to find that the district court's lack of territorial jurisdiction "is not a mere 'technical defect' but is in fact a central and functional safeguard underlying [Title III]." The government argues that suppression is not warranted because the territorial jurisdiction requirement

10

was not among Congress's core concerns when enacting Title III. The district court held that territorial jurisdiction was not a central or functional safeguard in the statutory scheme.

The purpose of Title III "was effectively to prohibit, on the pain of criminal and civil penalties, all interceptions of oral and wire communications, except those specifically provided for in the Act, most notably those interceptions permitted to law enforcement officers when authorized by court order in connection with the investigation of the serious crimes listed in § 2516." *Giordano*, 416 U.S. at 514 (footnote omitted). "Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." *Adams v. Lankford*, 788 F.2d 1493, 1498 (11th Cir. 1986) (quoting S. Rep. No. 1097).

Other courts have determined that the territorial jurisdiction limitation in Title III does not "directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *See, e.g., Lankford*, 788 F.2d at 1500; *United States v. Rodriguez*, 734 F. Supp. 116, 120 (S.D.N.Y. 1990) aff'd, 968 F.2d 130 (2d Cir. 1992). In *Lankford*, a case dealing with wiretaps authorized by a state court judge, the Eleventh Circuit court found that the legislative history was silent regarding the core concerns of Title III and the requirement that a judge authorize interceptions within the court's territorial jurisdiction. 788 F.2d at 1498. Further, the court found that because the territorial jurisdiction of a state court is subject to state determination, and Congress gave no indication of a desire to counter this uncertainty by defining "territorial jurisdiction" for purposes of

wiretapping, Congress did not consider this geographical limitation a core concern. *Id*. at 1499-1500.

I disagree and think that the territorial jurisdiction limitation serves important substantive interests and implicates core concerns of the statute, despite the lack of legislative history. In *Giordano*, the Supreme Court held that a provision requiring a Department of Justice official to authorize an application for a wiretap was "intended to play a central role in the statutory scheme," because the requirement substantively limited the use of wiretaps. 416 U.S. at 527-28. "[S]uch a precondition would inevitably foreclose resort to wiretapping in various situations where investigative personnel would otherwise seek intercept authority from the court and the court would very likely authorize its use." *Id*. at 528. Title III's territorial restrictions prevent forum manipulation by law enforcement, similarly preventing wiretap authorizations in cases where investigators would otherwise be able to obtain them. Limiting the number of district judges authorized to issue a wiretap warrant reduces the opportunity for the government to use forum manipulation to obtain a warrant that may not be approved elsewhere. I fail to see how this is not a significant protection of privacy. Territorial limitations on a district court directly implicate Congress's intent to guard against the unwarranted use of wiretapping.

Although application of the plain language may create a circuit split and potentially reduce the efficiency of the government to intercept communications from any available listening post, this is not a reason for our court to apply the law in contravention of the plain language of the statute. The language of the statute is clear and must be applied as written.[1]

---

[1] I recognize that this holding yields a strange result in this case. Although the Mississippi district court judge did not have territorial jurisdiction under the statute, he arguably was in the best position to balance privacy concerns with the appropriateness of interception. *See* United States Department of Justice Electronic Surveillance Manual,

No. 11-60763

---

DOJML Comment § 9-7.000 (instructing that when requesting interception of a cellular or mobile telephone, "[t]he order should specifically authorize such extra-jurisdictional interceptions, and *should be sought in the jurisdiction having the strongest investigative nexus to the object in which the monitoring device is installed*") (emphasis added). However, this court bound to apply the law as it written. *See United States v. Guidry*, 456 F.3d 493, 501-02 (5th Cir. 2006) ("When the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" (quoting *Caminetti v. United States,* 242 U.S. 470, 485 (1917))). It is for the United States Congress to determine whether, in light of technological advances, the statute should be amended. *See Caminetti* 242 U.S. at 490 ("If the words are plain, they give meaning to the act, and it is neither the duty nor the privilege of the courts to enter speculative fields in search of a different meaning.")