**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MICHAEL CAREY, AKA
Garrocha,
*Defendant-Appellant.*

No. 14-50222

D.C. No.
3:11-cr-00671-WQH-1

OPINION

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted May 6, 2016
Pasadena, California

Filed September 7, 2016

Before: Alex Kozinski, William A. Fletcher,
and Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould;
Dissent by Judge Kozinski

# SUMMARY[*]

## Criminal Law

The panel vacated the district court's order denying the defendant's motion to suppress evidence derived from the use of wiretaps.

The panel held that police may use evidence obtained in "plain hearing" when they overhear speakers unrelated to the target conspiracy while listening to a valid wiretap, without having complied with the Wiretap Act requirements of probable cause and necessity as to those specific speakers, but that agents must discontinue monitoring the wiretap once they know or reasonably should know that the phone calls only involved speakers outside the target conspiracy.

Because the record does not show exactly when agents knew or should have known that the phone conversations did not involve the persons involved in the target conspiracy, the panel vacated the district court's denial of the motion to suppress and remanded to the district court on an open record to determine what evidence was lawfully obtained in "plain hearing."

Judge Kozinski dissented from the part of the opinion where the majority remands on an open record. He wrote that if the record does not show whether the agents reasonably believed that the conspiracies were related until after a traffic

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

stop, the defendant, who presented no evidence contradicting an agent's sworn declaration, has only himself to blame.

## COUNSEL

Knut Sveinbjorn Johnson (argued) and Emerson Wheat, San Diego, California, for Defendant-Appellant.

Peter Ko (argued), Assistant United States Attorney, Chief, Appellate Section, Criminal Division; Laura E. Duffy, United States Attorney; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

**OPINION**

GOULD, Circuit Judge:

Acting pursuant to the Wiretap Act, 18 U.S.C. §§ 2510–22, federal agents secured a wiretap order for a San Diego phone number based on evidence that Ignacio Escamilla Estrada (Escamilla) was using the number in a drug smuggling and distribution conspiracy. Agents monitoring the wiretap overheard drug-related phone conversations. At some point during a seven-day period, the agents realized that Escamilla was not using the phone. Agents continued listening, however, believing at least initially that the people speaking on the phone might have been part of the Escamilla conspiracy. The seven days of wiretap monitoring culminated in a traffic stop, and agents then confirmed that the persons on the phone had no connection to Escamilla.

Appellant Michael Carey was eventually identified as a speaker in some of the phone calls, and he was then charged with conspiracy to distribute cocaine. Carey moved to suppress the evidence obtained from the wiretaps, arguing that the government violated the Wiretap Act by never applying for a wiretap as to him or his coconspirators. The district court denied the motion, ruling that the government could rely on the Escamilla order to listen to Carey's conversations.

The Fourth Amendment provides an exception to the warrant or probable cause requirement when police see contraband in "plain view." We adopt a similar principle today and hold that the police may use evidence obtained in "plain hearing" when they overhear speakers unrelated to the target conspiracy while listening to a valid wiretap, without

having complied with the Wiretap Act requirements of probable cause and necessity as to those specific speakers. However, the agents must discontinue monitoring the wiretap once they know or reasonably should know that the phone calls only involved speakers outside the target conspiracy. *Cf. Maryland v. Garrison*, 480 U.S. 79, 87 (1987).

The district court did not apply these principles, and the record in this case does not show exactly when agents knew or should have known that the phone conversations did not involve Escamilla and his coconspirators. We vacate the district court's denial of Carey's motion to suppress and remand to the district court on an open record to determine what evidence was lawfully obtained in "plain hearing."

## I

On March 5, 2010, the district court granted FBI Special Agent Christopher Melzer's application for a wiretap order for several phone numbers thought to be associated with a drug conspiracy led by Ignacio Escamilla Estrada (Escamilla). The phone number designated "T-14" was believed to belong to Escamilla. The wiretap of T-14 went live on March 5, although no calls were intercepted until March 10.

Starting on the 10th, the agents overheard "drug-related" calls, but at some point the agents realized that the person using T-14 was not Escamilla. The agents did not know who the people speaking on T-14 were, although Melzer initially "thought the callers and calls might still be affiliated with [the] known targets or part of the criminal activity [he] was investigating." Melzer consulted with federal prosecutors, and agents continued to monitor the calls.

On the morning of March 17, 2010, agents intercepted a call indicating that someone would be traveling with "invoices" (believed to be code for drug money). The agents coordinated with local police officers to execute a traffic stop on a car involved in the phone calls. Officers identified the driver as Adrian Madrid and searched the vehicle, finding cash and a cellphone tied to the T-14 number. Officers then obtained a search warrant for a related residence and found cocaine. Now knowing Madrid's identity, Melzer learned that there was an ongoing DEA/ICE investigation into Madrid and his associates. Melzer met with ICE and DEA agents, and they concluded that there was no "overlap" between the Madrid and Escamilla conspiracies.

Agents later identified Carey as a member of Madrid's conspiracy.[1] Carey was indicted in February 2011 for conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. He filed a motion to suppress "any and all evidence derived from the use of wiretaps," arguing that the government failed to comply with the Wiretap Act, 18 U.S.C. §§ 2510–22, with respect to Carey and his coconspirators. In Carey's view, the government instead had unlawfully "relie[d] on the validity of the Escamilla order to justify the independent and unrelated use of wiretap surveillance against Mr. Carey." Carey also requested a *Franks*[2] hearing to "fill in the holes" of a declaration by

---

[1] Phone calls intercepted by the wiretap referred to "Garrocha," apparently Carey's nickname, but the record does not show when agents made that connection. The record also does not reveal how Carey's associate, Jose Antonio Hernandez-Gutierrez, ended up with Escamilla's phone number.

[2] *See Franks v. Delaware*, 438 U.S. 154 (1978).

Special Agent Melzer that had been submitted to the district court to explain the agents' and officers' actions in connection with the wiretap.

The district court denied the motion to suppress, reasoning that the government had complied with the statute to obtain the wiretap order against Escamilla and holding that "[t]here was no requirement for a separate showing of necessity once the agents concluded that T-14 was not primarily used by Escamilla. The agents reasonably believed that the callers and calls might be affiliated with Escamilla or other offenses." Carey pled guilty in an agreement that preserved his right to appeal the denial of his motion to suppress. Carey's appeal was timely and we have jurisdiction under 28 U.S.C. § 1291.

## II

In 1967, the Supreme Court issued two opinions discussing the constitutionality of certain phone surveillance techniques. In *Berger v. New York*, 388 U.S. 41 (1967), the Court invalidated a New York wiretap statute as "too broad in its sweep resulting in a trespassory intrusion into a constitutionally protected area." *Id.* at 44. Then in *Katz v. United States*, 389 U.S. 347 (1967), the Court held that federal agents violated the Fourth Amendment by eavesdropping on and recording a telephone call without a warrant. *Id.* at 348, 357–59.

Congress took note of these foundational decisions when passing the Omnibus Crime Control and Safe Streets Act of 1968. *See United States v. U.S. Dist. Ct. for the E. Dist. of Mich.*, 407 U.S. 297, 302 (1972). Title III, which is known colloquially as the Wiretap Act, prescribes certain procedures

that the government must follow to secure judicial authorization for a wiretap. *See United States v. Giordano*, 416 U.S. 505, 507 (1974) (citing 18 U.S.C. §§ 2510–20). The government must demonstrate probable cause that a particular offense has been or will be committed, *see* 18 U.S.C. § 2518(1)(b); *United States v. Kahn*, 415 U.S. 143, 155 (1974), and the government must demonstrate "necessity" for the wiretap by showing that traditional investigative procedures did not succeed or would be too dangerous or unlikely to succeed if tried, *see* 18 U.S.C. § 2518(1)(c); *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001). The statute also requires the government to adopt minimization techniques to "reduce to a practical minimum the interception of conversations unrelated to the criminal activity under investigation." *United States v. McGuire*, 307 F.3d 1192, 1199 (9th Cir. 2002); *see* 18 U.S.C. § 2518(5).

If the government uses a wiretap in violation of the statute, evidence obtained from the wiretap is inadmissible against the conversation's participants in a criminal proceeding. *Giordano*, 416 U.S. at 507–08; *see* 18 U.S.C. § 2515. Carey argues that suppression is warranted here because the government did not comply with these statutory requirements as to him or his coconspirators—the government's wiretap application instead demonstrated probable cause and necessity only as to Escamilla's conspiracy.

As a preliminary matter, the government argues that the only Wiretap Act argument Carey has preserved is his necessity argument: whether the agents violated 18 U.S.C. § 2518(1)(c) by listening to Carey's phone calls without first trying "other investigative procedures" or explaining "why

they reasonably appear to be unlikely to succeed if tried or to be too dangerous." At oral argument on appeal, the government further suggested that Carey's argument that the government could not rely on the Escamilla wiretap to listen to Carey's calls was an argument about the proper "execution of the order" rather than "the necessity showing."

In this context, however, we see no meaningful difference between the argument presented to the district court and that presented on appeal. While Carey's suppression brief primarily discussed necessity, he argued in substance that the government could not "rel[y] on the validity of the Escamilla order to justify the independent and unrelated use of wiretap surveillance against Mr. Carey." The government recognized that this was the premise of Carey's argument, responding with its view that "agents properly continued to intercept T-14 even after determining Escamilla was not the primary user." And this claim was further fleshed out before the district court when, in dialogue with the judge, Carey's lawyer argued that "[a]t the point in that time during that 15-day period they [the agents] realize this is a separate and distinct conspiracy group of people, they have to stop" and "make the required showing, obtain the authorization for the wiretap for that separate and distinct group of people." Even on appeal the government recognizes in its brief that "the circumstances under which interception occurred" were placed "squarely at issue" in Carey's suppression motion, which charged that "Melzer knew, at the time of interception, the T-14 calls were 'unrelated to the Escamilla investigation.'"

Carey's arguments to the district court adequately conveyed the thrust of his argument on appeal that the

Escamilla wiretap order did not authorize the government to listen to Carey's phone calls. Carey's claim is preserved.

## III

Turning to the question whether agents could lawfully use the Escamilla wiretap to listen to Carey's conversations, we note that there is a lack of Ninth Circuit precedent squarely on point. While the Wiretap Act allows officials to intercept and use calls "relating to offenses other than those specified in the order of authorization or approval," 18 U.S.C. § 2517(5), we have found no case in which this statutory provision was used to authorize officers to listen to people who were unaffiliated with the initial wiretap subjects.[3] Carey cites several cases for the proposition that the necessity showing in a wiretap application must be specifically tailored to the target subjects,[4] but none of these cases involves a situation in which a concededly valid wiretap order was used to obtain evidence of an unrelated person's crime.

Here the government showed necessity and probable cause for a wiretap of the target conspiracy. But what

---

[3] *See United States v. Reed*, 575 F.3d 900, 911 (9th Cir. 2009) (allowing government to introduce calls of Jackson intercepted on a wiretap for Reed when agents initially thought the phone was Reed's, Jackson was a "previously unknown associate of Reed," and "the record shows that TT10 was being used in the furtherance of Reed's PCP enterprise"); *United States v. Baker*, 589 F.2d 1008, 1011 (9th Cir. 1979) (per curiam) (allowing government to introduce calls of Baker intercepted on a wiretap for Judd when Baker was speaking to Judd). While the government relies on these cases, it concedes that they "are not perfect fits."

[4] *See, e.g.*, *United States v. Staffeldt*, 451 F.3d 578, 579 (9th Cir. 2006); *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1115 (9th Cir. 2005); *Blackmon*, 273 F.3d at 1208–09.

happens when a wiretap that is valid at its inception is later used to listen to someone who is not involved in the conspiracy under surveillance? It is that novel question to which we turn our attention.

The Seventh Circuit has addressed a similar situation in dicta. Writing for that court, then-Chief Judge Posner explained, "It is true that if government agents execute a valid wiretap order and in the course of executing it discover that it was procured by a mistake and at the same time overhear incriminating conversations, the record of the conversations is admissible in evidence. It is just the 'plain view' doctrine translated from the visual to the oral dimension." *United States v. Ramirez*, 112 F.3d 849, 851 (7th Cir. 1997) (internal citations omitted). "But," the court continued, "once the mistake is discovered, the government cannot use the authority of the warrant, or of the [wiretap] order, to conduct a search or interception that they know is unsupported by probable cause or is otherwise outside the scope of the statute or the Constitution." *Id.* at 852 (citing *Maryland v. Garrison*, 480 U.S. 79, 87 (1987)).[5] We conclude that the Seventh Circuit's observations are persuasive.

These conclusions are drawn by analogy to Fourth Amendment case law. In *Maryland v. Garrison*, 480 U.S. 79 (1987), officers secured a warrant for Lawrence McWebb's residence at "2036 Park Avenue third floor apartment." *Id.* at 80. When the officers entered, they "reasonably concluded" that the third floor was only one apartment unit, but they soon discovered that the floor was divided into two

---

[5] This discussion in *Ramirez* was dicta because the court held that the wiretap was not being used illegally when agents mistakenly listened to phone calls in Minnesota rather than Wisconsin. *Id.* at 852–53.

apartments—one McWebb's, the other Garrison's. *Id.* at 81. Before the officers realized that, they saw drug contraband in Garrison's apartment. *Id.* at 80. The Court held that the search "[p]rior to the officers' discovery of the factual mistake" did not violate the Fourth Amendment so long as the officers' failure to realize the mistake "was objectively understandable and reasonable." *Id.* at 88.

But at the same time, the Court emphasized that the officers "were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." *Id.* at 87. We have applied this rule from *Garrison* in similar situations. *See, e.g.*, *Mena v. City of Simi Valley*, 226 F.3d 1031, 1038–39 (9th Cir. 2000); *Liston v. County of Riverside*, 120 F.3d 965, 979 (9th Cir. 1997) ("Until the officers learned that they were in the wrong house, the officers could have reasonably believed . . . that the way they conducted the search was lawful. . . . But once they knew the house belonged to the Listons, their search was no longer justified.").

Despite the Seventh Circuit's decision in *Ramirez*, both the government and Carey resist the application of this doctrine to the wiretap context. Carey states that *Garrison* "has limited application to wiretaps" because of the procedural requirements of the Wiretap Act. This argument is unavailing because the government did comply with the statute to get a valid wiretap for Escamilla on T-14. The question here is whether the government could use that valid wiretap to listen to unrelated people's phone calls—a concern that mirrors the question in *Garrison* whether officers could

rely on a valid warrant for entry into an unrelated person's apartment.

The government, on the other hand, argues that the agents could continue monitoring the wiretap even after realizing that they were not listening to the target conspiracy. The government urges that the wiretap order in this case authorized interception of drug calls by "others yet unknown" over T-14. In the government's view, Carey is such an unknown person. Read in context, however, the wiretap order does not extend to unknown people not involved in the Escamilla conspiracy.

Having carefully reviewed the full record, including any portions filed under seal, we conclude that the provisions of the wiretap order persuasively indicate that the unknown people referred to in the wiretap order must be involved with the Escamilla conspiracy; the order does not authorize the wiretap of "others yet unknown" participating in a *conspiracy* "yet unknown." Moreover, the wiretap order could not authorize surveillance of an unknown conspiracy because the statute requires agents to demonstrate probable cause and necessity to procure a wiretap order. 18 U.S.C. § 2518(1)(b)–(c). Agent Melzer's affidavit contained probable cause that "others yet unknown" were participating in the Escamilla conspiracy, but it understandably contained no information about unknown people engaged in drug trafficking outside the Escamilla conspiracy.

The government also argues that agents could listen to Carey's conversations because the Wiretap Act permits the collection of evidence of other crimes under 18 U.S.C. § 2517(5). That provision authorizes the government to use "communications relating to offenses other than those

specified in the order of authorization or approval." But importantly—and fatally to the government's argument—the statute does so only when officers are "engaged in intercepting wire, oral, or electronic communications in the manner authorized herein." 18 U.S.C. § 2517(5). Because the order does not authorize agents to listen to conversations by individuals outside the Escamilla conspiracy for the reasons stated above, this provision does not help the government here.

In short, we see no reason to depart from principles requiring cessation of a wiretap once the government knows or reasonably should know that the person speaking on the tapped line is not involved in the target conspiracy. *See Ramirez*, 112 F.3d at 851–52. The government may use evidence obtained from a valid wiretap "[p]rior to the officers' discovery of [a] factual mistake" that causes or should cause them to realize that they are listening to phone calls "erroneously included within the terms of the" wiretap order. *Cf. Garrison*, 480 U.S. at 87–88. And once the officers know or should know they are listening to conversations outside the scope of the wiretap order, they must discontinue monitoring the wiretap until they secure a new wiretap order, if possible. *Cf. id.* at 87.

## IV

Applying this rule to Carey's case, we first note that Carey does not challenge the validity of the wiretap order as to Escamilla, so the agents were justified in initially listening to the conversations on T-14. But because the order did not authorize agents to listen to Carey or his associates, the government may only use evidence obtained in accordance with the "plain hearing" doctrine discussed above.

The record does not indicate what evidence was obtained before the agents knew or should have known that they were listening to calls outside of the Escamilla conspiracy. Melzer's declaration stated, "Within that time frame [March 10–17], after an amount of time that I do not recall exactly, we concluded that the person using T-14 was not Ignacio Escamilla Estrada.  We also did not know the identities of the persons calling T-14."  While Melzer's declaration suggests that he "thought the callers and calls might still be affiliated with" the Escamilla conspiracy, the record does not show whether he continued or reasonably could have continued to hold that belief through March 17.  In fact, at some point agents consulted with federal prosecutors about whether they could or should continue to intercept calls on the wiretap.

It is unclear how much of the government's wiretap evidence may fall outside of the "plain hearing" doctrine. Because the parties staked out polarized positions before the district court—the government arguing for all wiretap evidence, Carey for none of it—and because the district court adopted the government's position in denying the motion to suppress, the record lacks the findings necessary to determine what evidence was admissible against Carey.[6]  We vacate the district court's order denying the motion to suppress and remand on an open record to determine what evidence is

---

[6] Carey "alternatively" sought a *Franks* hearing to "fill in the holes" in Melzer's declaration.  But this request does not fit into the *Franks v. Delaware*, 438 U.S. 154 (1978), framework because the Melzer declaration was not an affidavit supporting a wiretap application.  *See id.* at 171–72 (explaining purpose of *Franks* hearing is to explore possible falsehoods in affidavit supporting request for search warrant); *United States v. Ippolito*, 774 F.2d 1482, 1484–85 (9th Cir. 1985) (applying *Franks* to wiretap applications).

admissible against Carey under the legal framework set forth above.

The dissent argues that Carey forfeited this relief by "fail[ing] to demonstrate in the district court that any evidence should be suppressed under the rule he advocated." Dissent at 22. This conclusion appears to stem from the dissent's premise that "Carey can hardly be surprised by the 'plain hearing' rule we adopt today" because he advocated for a similar rule in the district court. Dissent at 18.

We disagree with this conclusion and its premise. Carey's primary argument in the district court was broader than the rule we adopt today. He did not concede that any evidence should be admitted under a plain hearing rule. Instead, Carey contended that "any and all evidence derived from the use of wiretaps" should be suppressed. Carey argued that the agents learned at some point that they were listening to an unrelated conspiracy, and therefore the wiretap order was invalid because it did not establish necessity as to him.

Also, while the dissent is correct that Carey did not present evidence "contradicting Agent Melzer's sworn declaration," dissent at 18, Carey argued to the district court that Melzer's declaration was lacking "specifically what level of knowledge [the agents] had between – when the wiretap started on March 10th through to March 17th." The dissent repeatedly emphasizes that Carey did not contest the accuracy of Agent Melzer's declaration. This is true, but beside the point. Carey's objection was not that the declaration was inaccurate; his objection was that it was *incomplete*. The district court recognized Carey's belief that "there are things that are not in his declaration that you believe would be

relevant facts," and the court was aware of Carey's alternate request to take evidence about Melzer's level of knowledge regarding the relationship between Escamilla and the phone calls. But because the district court then applied the wrong legal standard, the district court did not believe that any additional evidence was necessary.[7]

As stated above, Carey and the government took polarized positions before the district court, and the correct legal standard lay somewhere in between. In such circumstances, we conclude that the proper course is to allow the parties to present more evidence on remand to determine whether any evidence should be suppressed under the proper legal standard that we have now declared.

**VACATED AND REMANDED**.

---

KOZINSKI, Circuit Judge, dissenting:

I join my colleagues insofar as they hold that the government may use evidence obtained from a valid wiretap until "officers know or should know they are listening to conversations outside the scope of the wiretap order." Op. at

---

[7] The dissent faults us for this "oblique suggestion," dissent at 21, but it is clear to us that Carey was seeking a *Franks* hearing to learn more about Melzer's knowledge of the speakers heard over the wiretap. As we acknowledged above, *see* note 6 *supra*, that is not a proper purpose of a *Franks* hearing. But counsel's mislabeling of his request does not change the fact that Carey's counsel put the district court on notice that counsel thought additional evidence could be necessary to resolve the suppression motion. And had the district court applied the correct legal standard, it would have recognized additional evidence was needed.

14. But I dissent from Part IV of the opinion where the majority remands with instructions that the district court apply this rule to Carey's case on an open record. If, as the majority recognizes, the "record does not show" whether the federal agents reasonably believed that the conspiracies were related until after the traffic stop, op. at 15, Carey has only himself to blame. He presented no evidence contradicting Agent Melzer's sworn declaration.

Carey can hardly be surprised by the "plain hearing" rule we adopt today: As the majority acknowledges, "Carey argued that the agents learned at some point that they were listening to an unrelated conspiracy," op. at 16, but he failed to identify a specific point. Instead, Carey relied *only* on the fact that the officers listened for seven days to the conversations on the phone.

But the length of time the officers listened is hardly dispositive of whether they realized or should have realized they were listening to a different conspiracy than the one covered by the warrant. That depends on what the officers heard and when they heard it. While agents eventually realized that Escamilla wasn't using the phone, the wiretap order also permitted them to intercept conversations of Escamilla's unknown co-conspirators. The agents could have reasonably believed that Escamilla had passed the phone to a confederate. FBI Agent Melzer declared under oath that he "thought the callers and calls might still be affiliated with [the] known targets or part of the criminal activity [he] was investigating." He claims he didn't definitively learn until after the traffic stop that the calls were unrelated to the Escamilla conspiracy. By expressly refusing to challenge the Melzer declaration, Carey conceded the point.

The majority is mistaken in saying that "Carey's primary argument in the district court was broader than the rule we adopt today." Op. at 16. Here's what Carey's lawyer argued in his motion in the district court:

Mr. Carey concedes the FBI reasonably believed the intercepted calls from T-14 could be related to the Escamilla conspiracy, at the beginning of interception. At some point, however, during the daily interceptions, with the number of calls mounting with new interceptees, it became less reasonable for the FBI to continue to believe this new conspiracy was related to Escamilla. As the Court is well aware, the FBI's investigation into the Escamilla conspiracy was vast and extensive. At some point, between March 10 to March 17, 2010, the FBI had to have realized that th[e] T-14 interceptions were part of a separate conspiracy – separate from, and unrelated to, the Escamilla conspiracy for which the wiretap was authorized.

When they knew, they should have stopped, worked with other law enforcement agencies investigating the Carey conspiracy and proceeded with a proper, traditional investigation. Instead, the FBI, knowing at some point that they were no longer investigating Escamilla and his co-conspirators, continued to monitor T-14 under the auspices and authority of the Escamilla wiretap.

And here's what Carey's lawyer said to the district court during oral argument:

> It is our position that at some point along that week as the calls were coming in, as the interceptees were being intercepted and they were not connected to the Escamilla extensive investigation, that the reasonableness of that agent to believe that was somehow related to Escamilla diminished. It diminished per call per day, all the way to the end of the week that where it is unreasonable then – where it started out being reasonable by the end of the week [sic].

Carey never identified a specific point when it became unreasonable for the agents to believe that they were still listening to the Escamilla conspiracy. Carey was given full discovery and thus had access to the recordings and transcripts of the intercepted phone conversations. If he believed that the agents should have known prior to the traffic stop that this was a different conspiracy, he could have pointed this out to the district court. Instead, he offered no evidence and explicitly declined to dispute the accuracy of Melzer's statement:

> The Court:        From your standpoint it is fair to say that you don't dispute the accuracy that Mr. Melzer set forth in his declaration? Your argument is that, well, there are things that are not in his declaration that

| | |
|---|---|
| | you believe would be relevant facts, but that as far as a – there is no disagreement with his declaration. |
| [Carey's lawyer]: | That is an accurate statement. |
| The Court: | So in deciding the motion, there is no objection to the Court relying on facts set forth in this declaration as true and as part of the record. |
| [Carey's lawyer]: | I think that is a fair statement. |

The majority is also mistaken in its oblique suggestion that Carey was seeking to obtain additional evidence or requested an evidentiary hearing "to take evidence about Melzer's level of knowledge regarding the relationship between Escamilla and the phone calls." Op. at 17. Here's what actually happened in the district court:

| | |
|---|---|
| [The Court]: | Is there any evidentiary – any witnesses in your view that would be necessary for an evidentiary hearing? It seems like it is a legal matter to me. |

[Carey's lawyer]: Except for the Franks hearing – outside of the Franks hearing, I don't see a need for an evidentiary hearing, other than perhaps Agent Crawl (phonetic) from the DEA was conducting the investigation while the FBI was conducting the wiretap. Outside of that I don't see any other relevant evidentiary purposes.

Carey thus expressly disowned the purposes the majority generously attributes to him. As for the *Franks* hearing, the majority recognizes that it's inapplicable to this situation. Op. at 15.

This isn't a case where we've announced an unforeseen rule, surprising a defendant who didn't have the opportunity to argue about its application in the district court. Carey's problem is that he failed to demonstrate in the district court that any evidence should be suppressed under the rule he advocated. I would affirm the district court's judgment rather than give Carey a mulligan.